

CREDIT SUISSE FIRST BOSTON CORPORATION

Eleven Madison Avenue
New York, NY 10010-3629

Telephone 212 325 2000

October 15, 2001

Motient Corporation
10802 Parkridge Boulevard
Reston, VA 20191

Attention: Bart Snell, Chief Financial Officer

Dear Bart:

      This letter agreement (this "Agreement") will confirm the understanding between Motient Corporation, a Delaware corporation, on behalf of itself and its affiliates and subsidiaries (collectively, the "Company") and Credit Suisse First Boston Corporation and its affiliates, successors and assigns, as appropriate ("CSFB"), pursuant to which the Company has retained CSFB as its exclusive financial advisor on the terms and subject to the conditions set forth herein, in connection with any complete and partial acquisitions, refinancings, repurchases, restructurings of, or any amendments or modifications to the Company's outstanding 12.25% Senior Notes due 2008 (the "Notes") by or on behalf of the Company (including any offer to purchase or exchange for cash, property, securities, indebtedness or other consideration, or a solicitation of consents, waivers or authorizations with respect thereto; or an issuance of equity or debt securities or incurrence of indebtedness in connection therewith). Any of the foregoing, or any combination thereof, including any series of related transactions are hereinafter referred to as a "Restructuring Transaction."

      1. <u>Retention</u>. The Company hereby retains CSFB as its exclusive financial advisor to provide the services outlined in this paragraph in connection with any Restructuring Transaction. Except in connection with a Section 3(a)(9) Offer (as defined in paragraph 3(d) below) in the case of the following items (ii), (iii) and (v) and subject to the terms and conditions of this Agreement, CSFB hereby agrees to provide the Company with general capital restructuring advice and to perform financial advisory services with respect to, and in connection with the terms and timing of, any Restructuring Transaction, including assisting the Company in: (i) analyzing the structure of any proposed Restructuring Transaction and of any new securities to be issued to the holders of the Notes in connection with any Restructuring Transaction; (ii) identifying, contacting and communicating with the holders of the Notes in connection with any Restructuring Transaction; (iii) negotiating with the holders of the Notes regarding the financial aspects of any Restructuring Transaction; (iv) preparing Offering Documents (as hereinafter defined) to the extent that such documents relate to the terms of any Restructuring Transaction; and (v) to the extent permitted by applicable law and pursuant to a definitive dealer manager agreement, soliciting tenders and consents in connection with any Restructuring Transaction. Except in connection with a Section 3(a)(9) Offer, at the Company's request and to the extent permitted by applicable law, CSFB shall act as dealer manager and/or soliciting agent with respect to any Restructuring Transaction. In the event CSFB acts as dealer manager or soliciting agent in connection with any Restructuring Transaction, the Company and CSFB agree to enter into a further agreement which shall include, among other things, representations, warranties and covenants and such other terms as CSFB may reasonably request taking into account customary practices and the nature and scope of the services



CREDIT SUISSE FIRST BOSTON

Motient Corporation
Page 2

October 15, 2001

to be rendered by CSFB in connection with such Restructuring Transaction; provided that the compensation and expense reimbursement provisions of paragraph 3 hereof shall govern under such further agreement without additional compensation being payable to CSFB thereunder.

2. <u>Further Agreements</u>. This Agreement does not constitute any agreement, express or implied, on the part of CSFB or any commitment by CSFB to underwrite, purchase, place, or cause the placement of any securities or indebtedness or to advise the Company in connection with any sale of any of its business or assets or in connection with any merger, consolidation or similar transaction. Any such commitment by CSFB shall be at CSFB's option and would, in each case, be subject to, among other things, the satisfactory completion by CSFB of an appropriate due diligence investigation of the Company and the execution by CSFB and the Company of a customary agreement acceptable to CSFB and its counsel on the one hand, and the Company and its counsel on the other. Any such agreement would include, among other things, customary representations, warranties, opinions and compensation agreements acceptable to CSFB and its counsel.

3. <u>Compensation and Expense Reimbursement</u>. In consideration of the obligations of CSFB hereunder, the character and sufficiency of which the Company hereby acknowledges, the Company agrees to pay CSFB, in cash, the following non-refundable amounts:

a) An up-front retainer (the "Retainer") of $200,000 due and payable immediately upon the execution of this Agreement.

b) A cash monthly fee (the "Monthly Fee") consisting of (i) $150,000 due and payable on each of December 3, 2001 and January 3, 2002 and (ii) $75,000 due and payable upon the 3rd day of every month, commencing February 3rd, 2002 and ending on the Date of Termination of this Agreement. Amounts above $400,000 of the aggregate Retainer and Monthly Fees, to the extent paid, will be credited against the last installment (if more than one installment is contemplated) any fees payable in paragraph 3(c) and 3(d) below.

c) A fee payable upon consummation of the transaction or series of related transactions comprising the Restructuring Transaction which involves at least 60% of the Company's Notes (the "Success Fee"); equal to the greater of: (a) 1.0% of the Face Amount (for purposes of this Agreement "Face Amount" means the principal amount due at maturity) of the Notes restructured in the Restructuring Transaction or (b) $2,000,000.

d) In addition, in connection with any Restructuring Transaction that is intended to comply with the requirements of Section 3(a)(9) of the Securities Act of 1933, as amended (a "3(a) (9) Offer"), the Company shall pay to CSFB the Success Fee upon the first mailing, delivery, or other dissemination of Offering Documents to any such holder in connection with each 3(a) (9) Offer.

In connection with any Restructuring Transaction that is intended to be effected, in whole or in part, as all or a portion of a "prepackaged" or "pre-negotiated" plan of reorganization anticipated to involve the solicitation of consents, waivers, acceptances, authorization or approvals (collectively, "Approvals") of such plan (a "Plan") in compliance with the bankruptcy laws of any jurisdiction, by or on behalf of the Company, from holders of any class of Notes or other debt of the Company, the



Company agrees promptly to pay CSFB (i) 50% of the Success Fee to be realized upon consummation of the contemplated Restructuring Transaction upon receipt of approvals of every class whose affirmative vote is necessary to confirm any such proposed Plan, or which are otherwise sufficient in the Company's view to justify commencing a bankruptcy case which is intended to be consummated as a "prepackaged" or "pre-negotiated" reorganization proceeding or case and (ii) the remaining 50% of the Success Fee upon the effective date of the Plan.

e) If the Company consummates any offering of equity, other than as part of a Restructuring Transaction, that is intended to be exempt from registration under the Securities Act of 1933 (a "Private Placement") that was commenced on or prior to the Date of Termination, CSFB shall be entitled to receive an aggregate, non-refundable cash transaction fee of 5% of the amount of the gross proceeds raised, due and payable immediately upon the closing date of such transaction, however, CSFB shall not be entitled to a fee for any equity raised in the Private Placement from the following existing shareholders (as of the date hereof) of the Company: Hughes Electronics Corporation and Apollo Management LP.

In the event that the Company consummates a sale of equity in an underwritten offering, other than as part of a Restructuring Transaction, pursuant to the Securities Act of 1933 (a "Public Offering") or a "block trade" that was commenced on or prior to the Date of Termination, the Company will grant CSFB the right of first refusal to act as lead placement agent or underwriter. CSFB and the Company will enter into a customary agreement acceptable to CSFB and its counsel on the one hand, and the Company and its counsel on the other. Any such agreement will include, among other things, customary representations, warranties, opinions and compensation agreements acceptable to CSFB and its counsel.

f) If the Company requests CSFB arrange any Private Placement of Debt prior to the Date of Termination, CSFB shall be entitled to receive an aggregate, non-refundable cash transaction fee of 3% of the amount of the gross proceeds raised, due and payable immediately upon the closing date of such transaction.

g) If the Company sells any or all of the Class A Common shares of XM Satellite Radio Holdings, Inc. (the "XM Shares") that it currently owns through either a Section 4(2) or 144A private placement or an underwritten offering of secondary shares or a "block trade", the Company will grant CSFB the right of first refusal for any such disposition of the XM Shares. CSFB, and the Company will enter into a customary agreement reflecting current market rates acceptable to CSFB and its counsel on the one hand, and the Company and its counsel on the other. Any such agreement will include, among other things, customary representations, warranties, opinions and compensation agreements acceptable to CSFB and its counsel.

h) In addition, and without regard to whether a Restructuring Transaction is commenced or consummated or whether this Agreement is terminated, the Company agrees to pay in cash, promptly as billed, all of the out-of-pocket expenses of CSFB incurred in



CREDIT SUISSE FIRST BOSTON

Motient Corporation
Page 4

October 15, 2001

connection with the services rendered by CSFB pursuant to this Agreement, including the reasonable fees and expenses of its counsel.

4. <u>Termination</u>. CSFB may resign and the Company may terminate CSFB's engagement hereunder upon 30 days' written notice (the "Date of Termination"). If the Company terminates the engagement of CSFB hereunder for any reason, however, CSFB shall be entitled to receive all of the fees earned and amounts payable in respect of expenses incurred pursuant to Section 3 hereof up to and including the Date of Termination; and provided, further, that if the Company terminates the engagement of CSFB hereunder and the Company or any affiliate of the Company thereafter proceeds with any Restructuring Transaction on or prior to 12 months after the Termination Date, CSFB shall be entitled to receive all of the amounts provided for in Section 3 hereof as if this Agreement were to remain in effect, without having been terminated, with respect to such Restructuring Transaction.

5. <u>Indemnity</u>. The Company agrees to indemnify the Indemnified Persons (as defined in Schedule A) as set forth in Schedule A hereto, which Schedule A is incorporated herein and made a part hereof.

6. <u>Representations and Warranties of the Company</u>. In addition to any representations and warranties for which provision is made in any placement agent, underwriting, dealer manager or other agreement as shall be entered into between the Company and CSFB, the Company represents and warrants to CSFB that at the commencement, throughout the continuance, and at the time of consummation of each Restructuring Transaction undertaken by the Company during the term of this Agreement:

(a) Each of the Offer Documents will comply in all material respects with the Securities Act, the Exchange Act, and the Trust Indenture Act of 1939, as amended (the "TIA" and collectively with the Securities Act and the Exchange Act, the "Acts"), as such Acts may be applicable, and in each case the applicable rules and regulations of the SEC thereunder, and with all material applicable rules or regulations of any governmental or regulatory authority or body, including applicable Blue Sky or similar securities laws or statutes, and no consent or approval of, or filing with, any governmental or regulatory authority or body is required in connection with the commencement or consummation of any such transaction, other than those consents or approvals which will have been obtained or any filing which will have been made prior to the consummation of each such transaction and other than notice filings which may be made after the consummation of such transaction without any adverse effect upon the Company;

(b) None of the Offer Documents and no other report, filing, document, release or communication published or filed by or on behalf of the Company in connection with any of such transactions will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(c) Any new securities ("New Securities") offered in consideration of any existing securities, including but not limited to, the Notes that are debt instruments (the


CREDIT SUISSE FIRST BOSTON

Motient Corporation
Page 5

October 15, 2001

"New Debt Securities"), if any, and the indentures pertaining to the New Debt Securities and any supplemental indentures pertaining to any amendments to the Notes (together, the "Indentures") will be duly authorized by the Company, and when the Indentures are duly executed in accordance with such authorization and when the New Securities are issued, the Indentures and the New Debt Securities will be the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and each of the New Securities and the Indentures, if any, will conform to the description thereof in the Offer Documents in all material respects;

(d) The New Securities that are capital stock, if any, will be duly authorized by the Company and, when issued, will be validly issued, fully paid and non-assessable;

(e) The New Debt Securities, if any, and the Indentures, if any, will comply in all material respects with the TIA;

(f) The issuance of the New Securities and the consummation of the transactions contemplated by the Offer Documents will not result in a breach of any of the terms or provisions of, or constitute a default or cause an acceleration of any obligation under, the Company's charter or bylaws or any material bond, note, debenture or other evidence of indebtedness or any material indenture, mortgage, deed of trust or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of them is bound, or any order of any court or governmental agency or authority entered in any proceeding to which the Company or any of its subsidiaries was or is a party or by which it or any of them is bound, except as could not, singly or in the aggregate, have a material adverse effect on the properties, business, results of operations or condition (financial or otherwise) of the Company, taken as a whole;

(g) This Agreement will be duly authorized and validly executed and delivered by the Company and will constitute a legal, valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and except as rights to indemnification and contribution under this Agreement may be limited by applicable law; and

(h) In connection with any Restructuring Transaction purported by the Company to be made pursuant to a 3(a)(9) Offer, the Company has not paid and will not pay any commission or other remuneration, directly or indirectly, for soliciting or recommending such 3(a)(9) Offer to any soliciting broker, dealer, salesman, agent,



employee, or director of the Company, or any other person involved in any way on behalf of the Company in conflict with such Section 3(a)(9).

In addition, the Company shall make such additional representations and warranties to CSFB as CSFB reasonably shall request, taking into account customary practices, the nature of the proposed transaction and the services contemplated to be rendered by CSFB.

For purposes of this agreement, the term "Offer Documents" means each document that is filed with the Securities and Exchange Commission (the "SEC") or that is otherwise made publicly available or that is sent or given to the holders of Notes in connection with any Restructuring Transaction (which may include, but is not limited to, the following: (i) offering circular(s), sales memoranda, private placement memoranda or other selling material, explanatory statement(s) whether or not filed with the SEC under the Securities Act of 1933, as amended, (iii) each registration statement, preliminary and final prospectus required to be filed with the SEC, (iv) each document required to be filed with the SEC pursuant to the provisions of the Securities Exchange Act of 1934, as amended, pertaining to any Restructuring Transaction, and (v) each appendix, attachment, amendment or supplement to any of the foregoing and all related documents, including, but not limited to, each related letter of transmittal and each related letter to holders of Notes).

7. <u>Certain Covenants of the Company</u>. The Company agrees as follows:

(a) In connection with CSFB's engagement, the Company will furnish CSFB with all information concerning the Company which CSFB reasonably deems appropriate and will provide CSFB with access to officers, directors, employees, accountants, counsel and other representatives (collectively, the "Representatives") of the Company. In performing our services hereunder, CSFB shall be entitled to rely without investigation upon all available information, including information supplied to us by or on behalf of the Company or its Representatives, and shall not be responsible for the accuracy or completeness of, or have any obligation to verify, the same or conduct any appraisal of assets or liabilities. All non-public information concerning the Company which is given to CSFB in connection with this engagement, unless otherwise available to CSFB, will be used solely in the course of the performance of our services hereunder and will be treated confidentially by us for so long as it remains non-public (provided that CSFB may disclose information provided to it in connection with this engagement to holders of the Old Securities and their affiliates, representatives and agents), except as otherwise required by judicial or regulatory process; and

(b) No advice rendered by CSFB, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without CSFB's prior written consent, such consent not to be unreasonably withheld. In addition, CSFB may not be otherwise referred to without our prior written consent, such consent not to be unreasonably withheld.

8. <u>Survival of Certain Provisions</u>. The compensation and expense reimbursement provisions contained in Sections 3 and 4 of this Agreement, the indemnity and contribution agreements contained in Section 5 of this Agreement (including Schedule A hereto), the



representations and warranties of the Company contained in Section 6 of this Agreement, and this Section 8 shall remain operative and in full force and effect regardless of (a) any investigation made by or on behalf of CSFB, or by or on behalf of any Indemnified Person (as such term is defined in Schedule A hereto), (b) consummation of any Restructuring Transaction, or (c) any termination or expiration of this Agreement, and shall be binding upon, and shall inure to the benefit of, any successors, assigns, heirs and personal representatives of the Company, CSFB, the Indemnified Persons and any such person.

9. <u>Opinions of Counsel</u>. Prior to the commencement and at the closing of each Restructuring Transaction, the Company's outside counsel shall deliver to CSFB an opinion or opinions reasonably satisfactory to CSFB and its counsel taking into account the nature of the Restructuring Transaction. The Company's counsel shall also deliver such other customary opinions covering matters incidental to each Restructuring Transaction as CSFB and its counsel may reasonably request.

10. <u>Notices</u>. Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (a) to the Company, at Motient Corporation, 10802 Parkridge Boulevard, Reston, VA 20191, Attention: Bart Snell, Chief Financial Officer (b) to CSFB at Credit Suisse First Boston, Eleven Madison Avenue, New York, New York 10010, Attention: Scott Seaton (21st Floor).

11. <u>Construction</u>. This Agreement, including Schedule A hereto, together with the engagement letter dated the date hereof between the Company and CSFB with respect to a Private Financing, incorporates the entire understanding of the parties with respect to a Restructuring Transaction or Private Financing and supersedes all previous agreements and shall be governed by, and construed in accordance with, the laws of the State of New York as applied to contracts made and performed in such State. The Company hereby irrevocably submits to the exclusive jurisdiction of the Federal and New York State courts located in the City of New York, Borough of Manhattan, in connection with any suit, action or proceeding related to this Agreement or any of the matters contemplated hereby, irrevocably waives any defense of lack of personal jurisdiction and irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. The Company irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Each Indemnified Person (as defined in Schedule A to this Agreement) is intended to be a third party beneficiary of this Agreement.

12. <u>Severability</u>. Any determination that any provision of this Agreement (including any provision of Schedule A hereto) may be, or is unenforceable shall not affect the enforceability of the remainder of this Agreement (including Schedule A hereto).

13. <u>Independent Contractor</u>. In connection with this engagement, CSFB is acting as an independent contractor and not in any other capacity, with duties solely owing to the Company.

14. <u>Full Service Securities Firm</u>. Please note that CSFB is a full service securities firm engaged in securities trading and brokerage activities, as well as providing investment banking and



financial advisory services. In the ordinary course of our trading and brokerage activities, CSFB or its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for its accounts or on the accounts of customers, in debt or equity securities of the Company or other entities that may be involved in the Restructuring Transaction.

15. <u>Headings</u>. The section headings in this Agreement have been inserted as a matter of convenience of reference and are not part of this Agreement.

16. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

17. <u>Third Party Beneficiaries</u>. This Agreement has been and is made solely for the benefit of the Company, CSFB and the other Indemnified Persons referred to in Section 5 and Schedule A hereof and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

18. <u>Modification</u>. This Agreement may not be modified or amended except in writing, duly executed by the parties hereto.



October 15, 2001

If the foregoing terms correctly set forth our agreement, please confirm this by signing and returning to CSFB a duplicate copy of this letter. Thereupon, this letter, as signed in counterpart, shall constitute our agreement on the subject matter herein.

CREDIT SUISSE FIRST BOSTON
CORPORATION

By: _____

Name:   Scott Seaton
Title:    Managing Director

Confirmed and agreed to as
of the date first above written:

Motient Corporation

By: _____

Name: _____

Title: _SVP & CFO_____


CREDIT SUISSE FIRST BOSTON

## SCHEDULE A

This Schedule A is a part of and is incorporated into that certain letter agreement (together, this "Agreement"), dated October 15, 2001 between Motient Corporation, on behalf of itself and its subsidiaries and Credit Suisse First Boston Corporation ("CSFB"). Capitalized terms used herein without definition shall have the meanings ascribed to them in such letter agreement.

The Company agrees to indemnify and hold harmless CSFB, its affiliates and its parent and its affiliates, and the respective directors, officers, agents and employees of CSFB, its affiliates and its parent and its affiliates (CSFB and each such entity or person, an "Indemnified Person") from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively "Liabilities"), and will reimburse each Indemnified Person for all fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "Expenses") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "Actions"), (i) caused by, or arising out of or in connection with, any untrue statement or alleged untrue statement of a material fact contained in the offer documents referred to in the agreement (including any amendments thereof and supplements thereto) ("Offer Documents") or by any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (other than untrue statements or alleged untrue statements in, or omissions or alleged omissions from, information relating to an Indemnified Person furnished in writing by or on behalf of such Indemnified Person expressly for use in the Offer Documents or (ii) otherwise arising out of or in connection with this Agreement advice or services rendered or to be rendered by any Indemnified Person pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions; provided that, in the case of clause (ii) only, the Company will not be responsible for any Liabilities or Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction which is no longer subject to appeal or further review to have resulted solely from such Indemnified Person's gross negligence or willful misconduct in connection with any of the advice, actions, inactions or services referred to above. The Company also agrees to reimburse each Indemnified Person for all Expenses as they are incurred in connection with enforcing such Indemnified Person's rights under this Agreement (including, without limitation, its rights under this Schedule A).

Upon receipt by an Indemnified Person of actual notice of an Action against such Indemnified Person with respect to which indemnity may be sought under this agreement, such Indemnified Person shall promptly notify the Company in writing; provided that failure so to notify the Company shall not relieve the Company from any liability which the Company may have on account of this indemnity or otherwise, except to the extent the Company shall have been materially prejudiced by such failure. The Company shall, if requested by CSFB, assume the defense of any such Action including the employment of counsel reasonably satisfactory to CSFB. Any Indemnified Person shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person, unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Person and the Company, and such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible hereunder for the fees and expenses of more than one firm of separate counsel in connection with any Action in the same jurisdiction, in addition to any local counsel. The Company shall not be liable for any settlement of any Action effected without its written consent (which shall not be unreasonably withheld). In addition, the Company will not, without prior written consent of CSFB, settle, compromise or consent to the entry of any judgment in or otherwise seek to



terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from all Liabilities arising out of such Action.

In the event that the foregoing indemnity is unavailable to an Indemnified Person other than in accordance with this Agreement, the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company and its shareholders, on the one hand, and to CSFB, on the other hand, of the matters contemplated by this Agreement or (ii) if the allocation provided by the immediately preceding clause is not permitted by the applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and CSFB, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations; provided that in no event shall the Company contribute less than the amount necessary to ensure that all Indemnified Persons, in the aggregate, are not liable for any Liabilities and Expenses in excess of the amount of fees actually received by CSFB pursuant to this Agreement. For purposes of this paragraph, the relative benefits to the Company and its shareholders, on the one hand, and to CSFB, on the other hand, of the matters contemplated by this Agreement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company or the Company's shareholders, as the case may be, in the transaction or transactions that are within the scope of this Agreement, whether or not any such transaction is consummated, bears to (b) the fees paid to CSFB under this Agreement.

The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Person pursuant to this agreement, the transactions contemplated hereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions except for Liabilities (and related Expenses) of the Company that are determined by a judgment of a court of competent jurisdiction which is no longer subject to appeal or further review to have resulted solely from such Indemnified Person's gross negligence or willful misconduct in connection with any such advice, actions, inactions or services.

The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Person's services under or in connection with, this Agreement.